UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DEBORAH ROSSMAN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No. 3:21-cv-40042-KAR |
| | ) | |
| | ) | |
| NASHOBA REGIONAL SCHOOL DISTRICT, | ) | |
| LAURA FRIEND, Individually, | ) | |
| ANN MARIE STOICA, Individually, and | ) | |
| BROOKE CLENCHY, Individually, | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT
(Dkt No. 46)

ROBERTSON, U.S.M.J.

Deborah Rossman ("Plaintiff") is suing her former employer, Nashoba Regional School

District ("Nashoba"), as well as Laura Friend ("Friend"), Ann Marie Stoica ("Stoica"), and

Brooke Clenchy ("Clenchy") (collectively, "Defendants"), variously for breach of contract

(Count I), violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148 (Count II),

disability discrimination in violation of federal and state law under both wrongful termination

and failure to accommodate theories (Counts III and IV), religious discrimination (Count VI),

retaliation (Count VII), and violation of the Massachusetts Civil Rights Act ("MCRA"), Mass.

Gen. Laws ch. 12, §§ 11H and 11I (Count VIII) (Dkt. No. 15).[1]  Presently before the court is a

motion by all Defendants for summary judgment in their favor on Counts I, II, III, IV, and VIII,

---

[1] Plaintiff voluntarily dismissed Counts V and IX, alleging age discrimination and a § 1983
claim, respectively.

as well as in Clenchy's favor on all counts alleged against her (Dkt. No. 46).  The parties have consented to this court's jurisdiction (Dkt. No. 17).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons set forth below, Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part.

## I.   LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' when a rational factfinder could resolve it either direction."  *Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 5 (1st Cir.), *rev. denied*, 885 F.3d 52 (1st Cir. 2018) (citing *Borges ex rel. S.M.B.W. v. Serrano–Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).  "A fact is 'material' when its (non)existence could change a case's outcome.  *Id*. (citing *Borges*, 605 F.3d at 5).

A party seeking summary judgment is responsible for identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'"  *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325).  If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute."  *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The record is viewed in favor of the nonmoving party, and reasonable inferences are drawn in the nonmoving party's favor.  *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d

411, 417 (1st Cir. 2017) (citing *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 68 (1st Cir. 2015)).

## II.    FACTUAL BACKGROUND[2]

Nashoba hired Plaintiff in early September 2020 to fill the position of "Grade 7 Science Teacher (Full Year Long Term Sub)" (Dkt. No. 54 at ¶ 1).  In doing so, Nashoba elected not to employ Plaintiff on a per diem basis, which it could have done (Dkt. No. 54 at ¶ 77).  On September 4, 2020, Nashoba sent Plaintiff an appointment letter confirming her employment effective September 8, 2020, and providing that she would be paid in accordance with Master's Step 13 of the collective bargaining agreement ("the CBA") between Nashoba Regional School District Committee and the Nashoba Regional Education Association Unit A at an annual salary of $92,699 (prorated) (Dkt. No. 54 at ¶¶ 2-6).  Plaintiff signed and returned the appointment letter and was assigned to the Luther Burbank Middle School, where Friend was Principal (Dkt. No. 54 at ¶¶ 7-8).  Clenchy was the Superintendent of Nashoba at the time (Dkt. No. 54 at ¶ 50). According to Defendants, Clenchy played no active role in the decision to hire Plaintiff; instead, her involvement, at most, consisted of a pro forma approval for the hiring decision recommended by others (Dkt. No. 54 at ¶ 50).  Plaintiffs respond by noting that, under Massachusetts law, school principals must obtain the approval of the superintendent for hiring decisions.  *See* Mass. Gen. Laws ch. 70, § 59B.

On October 20, 2020, Nashoba sent Plaintiff a letter verifying Plaintiff's employment as a Grade 7 Science Teacher for the 2020/2021 school year based on Step 13 B30/M of the CBA

---

[2] The court draws the facts from Plaintiff's Response to Defendant's [sic] Statement of Material Facts (Dkt. No. 54), which included Defendants' Local Rule 56.1 statement of material facts, as well as Plaintiff's responses and Plaintiff's own Local Rule 56.1 statement of material facts, as well as Defendants' responses. Unless stated otherwise, the facts are undisputed.

with an annual salary of $90,180.01 (Dkt. No. 54 at ¶¶ 11-13).  While Plaintiff, as a long-term substitute, was not a member of the union and was so advised by the Union President in an October 30, 2020, email, Nashoba applied the evaluation process called for by the CBA and afforded Plaintiff the number of sick and personal days – 15 and 3, respectively – on  a lump sum basis as called for by the CBA, meaning that Plaintiff could have used up all of her sick days at once, up front, had she needed to do so (Dkt. No. 54 at ¶¶ 14-18, 59, 66).  It is Plaintiff's position that, even though she was admittedly not a member of the union, the parties intended her employment to be governed by some terms of the CBA, which provides in Section V that "[n]o employee shall be disciplined, dismissed, or reduced in rank or compensation without just cause" (Dkt. No. 54 at ¶ 74).

While Plaintiff was employed by Nashoba, she suffered from kidney stones, which her doctors treated by, among other things, prescribing her antibiotics and pain medication (Dkt. No. 54 at ¶¶ 19, 24).  Kidney stones are a chronic condition for Plaintiff, as she will always have them, but she can experience an acute episode when a stone gets lodged in her urinary tract (Dkt. No. 54 at ¶ 87).  Plaintiff attributed her absences from work on November 3, November 12, and November 16, 2020, to the symptoms of her kidney stones (Dkt. No. 54 at ¶ 20).  Plaintiff was also out of work on October 26, 2020; at the time, she informed Nashoba that she had an upset stomach likely due to eating bad sushi, but she later testified that the symptoms she had been experiencing may have been the beginning of acute symptoms from one or more kidney stones (Dkt. No. 54 at ¶¶ 21-22).  Plaintiff visited a hospital once for the treatment of her kidney stones while she was employed by Nashoba (Dkt. No. 54 at ¶ 23).  Plaintiff was also diagnosed with a prolapsed bladder in or around August of 2019 and was treated with a pessary (Dkt. No. 54 at ¶¶ 25-26).  According to Plaintiff, her symptoms from both of her conditions include the need to

consume more fluids and to urinate more frequently, discomfort and pain while urinating and while sitting or standing for prolonged periods of time, and increased urinary tract and yeast infections, although Plaintiff could not identify the number of urinary tract or yeast infections, if any, that she experienced during her employment by Nashoba or estimate how long she could sit or stand before becoming uncomfortable (Dkt. No. 54 at ¶¶ 27-30).

Nashoba terminated Plaintiff's employment on December 4, 2020, before she had completed 90 calendar days of employment (Dkt. No. 54 at ¶¶ 31-32).  While Stoica, Nashoba's Director of Human Resources, averred in an affidavit that Plaintiff had accrued 4.5 sick days and taken 9 during her employment, her final pay stub reflects that she had accrued fifteen and taken 8, leaving an unused balance of 7 (Dkt. No. 54 at ¶¶ 33, 45).  All of Plaintiff's requests for sick leave had been approved, and Friend never spoke to Plaintiff about her use of sick time (Dkt. No. 54 at ¶¶ 70-71).  Plaintiff also took one personal day (Dkt. No. 54 at ¶ 34).  When Stoica told Plaintiff that her employment was being terminated, she advised Plaintiff that she had exceeded her allowed 1.5 sick days per month, a limitation which Plaintiff notes is neither a written policy nor a provision in the CBA (Dkt. No. 54 at ¶¶ 67-68).  Stoica also told Plaintiff that Nashoba was not required to give her a reason for the termination of her employment and would not do so (Dkt. No. 54 at ¶ 68).

Nashoba pays its teachers in either twenty-two or twenty-six equal bi-weekly payments, depending on whether the teacher elects to be paid through the summer;[3] teachers who elect twenty-six equal payments can also elect to have their summer compensation paid in a lump sum

---

[3] The Massachusetts Wage Act provides that as to school teachers that "compensation may be deferred to the extent that equal payments may be established for a 12 month period including amounts payable in July and August subsequent to the end of the school year."  Mass. Gen. Laws ch. 149, § 148.

at the end of the school year (Dkt. No. 54 at ¶¶ 35, 37).  Plaintiff elected to receive twenty-six payments and was paid $3,757.50 every two weeks (Dkt. No. 54 at ¶¶ 38).  According to Stoica, when an employee is separated from employment before the end of the school year, Nashoba calculates the final paycheck as follows: (1) it divides the teacher's annual salary by the number of days the teacher was scheduled to work through the entire year, which resulting figure is the teacher's "Daily Rate;" (2) it then calculates the number of "Compensable Days" by adding the number of days actually taught and the number of sick days taken, and subtracting the number of sick days taken that had not yet accrued; and (3) it multiplies the Daily Rate figure by the Compensable Days figure, with the product representing the teacher's "Earned Wages Upon Separation" (Dkt. No. 54 at ¶ 40).  Applying this method to calculate Plaintiff's Earned Wages Upon Separation, Defendants maintain that they multiplied Plaintiff's Daily Rate of $503.80 times her Compensable Days number of 52.5 (consisting of the 57 days she worked + 9 sick days - 4.5 unaccrued used sick days + 1 accrued used personal day), leading to a figure of $26,449.50 (Dkt. No. 54 at ¶¶ 43-47).  Plaintiff had been paid $22,545.00 before the termination of her employment, so her final paycheck was the difference between her Earned Wages Upon Separation of $26,449.50 and her paid wages of $22,545.00, or $3,904.44 (Dkt. No. 54 at ¶¶ 48-49, 48-49).

Plaintiff contests that the "Daily Rate" times "Compensable Days" method is a universal practice or the proper way to ensure that teachers are paid their proportionally earned wages (Dkt. No. 54 at ¶¶ 40-41).  Plaintiff also notes that Stoica represented in a December 15, 2020, email to Plaintiff that she calculated her final paycheck as follows:

> Your daily rate was $503.80.  Your period of employment was 57 days, for a total of $28,716.60.  You used nine sick days, but were only entitled to a pro-rated 4.5 days, for a reduction of $2,267.10. Therefore, your earned salary was $26,449.50.

6

> You received six paychecks at $3,757.50 each, for a total of
> $22,545.  Your final additional paycheck on December 4,
> therefore, was $3,904.44

(Dkt. No. 54 at ¶¶ 39, 72).  In any event, Plaintiff disagrees with Defendants' calculation of her

earned wages at $26,449.50.  Plaintiff acknowledges that she elected to receive twenty-six bi-

weekly paychecks, which, at a salary of $92,699.00 for the school year, worked out to $3,757.50

per paycheck.  However, Plaintiff argues that, had she elected to receive twenty-two instead of

twenty-six bi-weekly paychecks, she would have been entitled to $4,213.59 bi-weekly, or

$2,106.795 weekly.  Calculating her earnings on that basis and treating her sick and personal

days as fully accrued, Plaintiff claims that her earned wages at the time of termination following

thirteen weeks of employment were $27,388.33.  According to Plaintiff, she would not have

accepted Nashoba's offer of employment had she been told that her sick days would be prorated

if her employment ended before the end of the school year (Dkt. No. 54 at ¶ 75).

This is not the first time Plaintiff has brought an action against an employer for

discrimination.  Before working for Nashoba, from June 2017 through June 2018, Plaintiff

worked for Assabet Valley Collaborative ("the Collaborative"), and, on May 11, 2018, she filed

a charge of disability discrimination with the Massachusetts Commission Against Discrimination

("MCAD") against the Collaborative (Dkt. No. 54 at ¶¶ 51-52).  Clenchy served on the Board of

Directors of the Collaborative as a function of being the Superintendent of Nashoba (Dkt. No. 54

at ¶ 53).  Clenchy was absent from the Board meeting during which Plaintiff's employment was

discussed, which took place on May 25, 2018; at that meeting, the Board decided to extend

Plaintiff paid administrative leave (Dkt. No. 54 at ¶ 56).  Clenchy maintains that she had no

knowledge or memory of Plaintiff's employment with the Collaborative or of her MCAD charge

against the Collaborative until after Plaintiff's employment with Nashoba ended.  Plaintiff

contends that the court should find this representation incredible (Dkt. No. 54 at ¶¶54-55).

## III.    DISCUSSION

### A.  Count I:  Breach of Contract Against Nashoba

In Count I of her amended complaint, Plaintiff states a claim for breach of contract

against Nashoba for wrongful termination in violation of her employment contract (Dkt. No. 15

at 10-11).  Specifically, Plaintiff alleges that she had a one-year employment contract with

Nashoba that included the benefits and protections of the CBA, notwithstanding the fact that she

did not have professional teacher status at Nashoba and was not a member of the union.

According to Plaintiff, Nashoba's termination of her employment violated that contract.

In moving for summary judgment, Defendants maintain that Plaintiff has not proffered

any basis for finding that the entirety of the CBA, including in particular the just cause for

dismissal requirement in Article V, applied to her employment.  Defendants note that Plaintiff

identified the following facts in her answers to interrogatories as the basis for her position that

her employment was to be governed by the terms of the CBA: the September 8, 2020, hiring

letter setting her salary at the Masters Step 13 level of the CBA; the October 20, 2020,

verification letter confirming that her salary would be based on Step 13 B30/M of the CBA; the

application of the evaluation provisions called for by Article V of the CBA to her, which process

does not pertain to teachers not covered by the CBA; the grant to her of the number of sick and

personal days called for by Article VII of the CBA in a lump sum in accordance with Article III

of the CBA; and Friend and the assistant principal telling her that she was covered by the CBA.

Defendants argue that these facts are insufficient to establish that the entirety of the CBA was

applicable to Plaintiff's employment and note that Plaintiff has failed to identify any documents

or conversations establishing an agreement as to how discipline was to be meted out or setting a standard for the termination of Plaintiff's employment. In addition, Defendants find fault with Plaintiff's theory because it relies on singling out the provisions of the CBA that are beneficial to Plaintiff while disregarding others that are not, including, for example, the grievance and arbitration procedures in Article III of the CBA.

By way of rejoinder, Plaintiff points to the parties' communications and conduct that, according to her, indicate that, at the least, Nashoba offered her certain pay and benefits, including paid sick leave, which it later reneged on when it reduced her compensation for using more than 1.5 sick days per month but still less than the 15 that had been issued to her in a lump sum upon hiring. Plaintiff identifies the following evidence as support for her theory: the SchoolSpring job posting to which she responded stated "Pay: In accordance with CBA;" Nashoba's offer letter to her indicated she would be paid in accordance with Master's step 13 of the CBA; her pay stubs reflect an allocation of 15 sick days and 3 personal days afforded on a lump sum basis at the start of her employment as provided in Article III of the CBA; Nashoba provided her health, dental, pension, and life insurance benefits not available to per diem substitutes not covered by the CBA; and Nashoba's verification letter stated that she would be paid in accordance with Step 13 B30/M of the CBA and would receive 70% and 50% contributions toward her health and dental plans, respectively. Plaintiff further suggests that Friend's evaluation of her performance in accordance with the process set forth in Article V of the CBA means that the "just cause for dismissal" limitation of Article V also applied to her employment. According to Plaintiff, Nashoba violated this provision when it terminated her employment for taking more than 1.5 sick days per month, despite the fact that there was no agreement limiting her use of her 15 sick days, which were allocated to her on a lump sum basis

on day one of her employment; that all the sick days she took had been approved; and that no one had ever spoken to her about her use of sick days.  As a fallback position, Plaintiff maintains that if she cannot recover traditional breach of contract damages, she should be permitted reliance damages because she took the job and took days off based on Nashoba's representation concerning sick day availability.

A breach of contract claim under Massachusetts law "requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013); *see Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24, 39 (Mass. 2016).  The existence of a valid, binding contract ordinarily presents a question of fact as to "whether any particular conduct or actions imply a contractual understanding." *Salem Laundry Co. v. New England Teamsters & Trucking Indus. Pension Fund*, 829 F.2d 278, 280 (1st Cir. 1987) (quoting *Corbin on Contracts* § 18(B), at 21 (*Kaufman* supp. 1984)).  However, the issue may be suitable for summary judgment if "the manifestations of intent of both parties to be bound, or of either not to be bound, are so unequivocal as to present no genuine issue of fact.'" *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 91 (1st Cir. 2002) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 415 (4th Cir. 1979)).

"The essential elements for the formation of a contract under Massachusetts law consist of an offer, acceptance, and consideration." *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 89 (1st Cir. 2018).  "It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Lambert v. Fleet Nat'l Bank*, 865 N.E.2d 1091, 1095 (Mass. 2007) (quoting *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 724 N.E.2d 699, 703 (Mass. 2000)).

Furthermore, "the determination of whether parties intended to be bound 'must be premised on the totality of all such expressions and deeds given the attendant circumstances and the objectives that the parties are attempting to attain.'" *Sinotau Pharm. Grp. v. Navidea Biopharmaceuticals, Inc.*, 211 F. Supp. 3d 375, 379-80 (D. Mass. 2016) (quoting *Black Horse Capital, LP v. Xstelos Holdings, Inc.*, No. Civ. A. 8542-VCP, 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014)).

Against this backdrop, none of Defendants' words or actions viewed in the light most favorable to Plaintiff could be viewed by a reasonable factfinder as establishing that Nashoba intended to be bound by the just cause for termination provision of the CBA with respect to the termination of Plaintiff's employment. The undisputed facts that Nashoba offered Plaintiff salary, sick leave, and health and dental benefits that mirrored those set forth in the CBA does not mean that Nashoba's offer of employment incorporated every other unmentioned provision in the 27-page CBA, including the just cause for termination requirement. Plaintiff has not cited any authority supporting this novel proposition, and the court rejects it. The same is true with respect to Plaintiff's suggestion that Nashoba breached its contract with her by deducting the value of 4.5 sick days from her pay. While the record supports a finding that Nashoba intended to offer Plaintiff employment with up to 15 paid sick days per year and that Plaintiff could use those 15 sick days immediately, the record does not similarly support a finding that Nashoba agreed to pay Plaintiff for sick days that she used before they had accrued.

Nor can Plaintiff avail herself of the theory of reliance damages to survive summary judgment. Setting aside the issue – raised by Defendants – of whether Plaintiff should be permitted to raise this new theory in response to a summary judgment motion, it is inapplicable on the facts. Plaintiff relies principally on *McAndrew v. Sch. Comm. of Cambridge*, 480 N.E.2d

327 (Mass. App. Ct. 1985), in which the defendants, the superintendent and school committee, appealed a judgment against them for breach of contract brought by the plaintiff following the termination of his employment.  The plaintiff, a resident of Georgia, had been offered a one-year "permanent" band leader and orchestra teacher position by the director and assistant director of music at the school, who also told him that his appointment would have to be approved by the school committee.  *Id*. at 329.  The plaintiff quit his teaching job in Georgia and, at a cost of approximately $3,000, moved to Massachusetts, where he taught for three weeks before the directors fired him without ever presenting his name to the school committee.  *Id*.  The appeals court reversed the judgment for the plaintiff on his breach of contract claim, finding that the jury had been incorrectly charged that they could find a breach of contract on common law principles because authority to employ the plaintiff was vested solely in the school committee by law.  *Id*. Nevertheless, the court remanded the matter limited to the issue of whether the plaintiff was entitled to a narrow category of damages arising from the directors' subsidiary promise to the plaintiff that, barring some valid reason, they would submit his name to the school committee, a promise which he accepted by moving to Massachusetts, and which itself established a contract. *Id*. at 331 & 332 n.10.  Here, Plaintiff has not identified a subsidiary promise that Nashoba failed to honor, nor has she identified any expenses that she incurred in reliance on the unfulfilled promise such as the $3,000 incurred by the plaintiff in *McAndrew* in moving to Massachusetts. *See Aronovitz v. Fafard*, 934 N.E.2d 851, 859 (Mass. App. Ct. 2010) ("Reliance damages are awarded only when the expenses would not have been incurred but for reliance on the contractual obligation not performed." (citing *Doering Equip. Co. v. John Deere Co.*, 815 N.E.2d 234, 240 (Mass. App. Ct. 2004))).  Thus, Nashoba is entitled to summary judgment on Count I of Plaintiff's amended complaint for breach of contract.

B.  <u>Count II: Violation of the Massachusetts Wage Act Against All Defendants</u>

Plaintiff brings a claim against all Defendants for violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, in Count II of her amended complaint.  According to Plaintiff, Defendants may be found liable under the Wage Act for improperly setting off the value of 4.5 sick days from her wages upon separation.  Plaintiff's theory can be broken down as follows: (1) her salary was $92,699 per year; (2) while she elected to be paid in 26 equal bi-weekly paychecks, she could have elected to be paid in 22 paychecks, which would have amounted to $4,213.59 per paycheck ($92,699 ÷ 22), or $2,106.795 in wages each week ($4,213.59 ÷ 2); (3) she was employed for 13 weeks and her weekly pay did not vary during weeks that included holidays or during which she took sick or personal days; (4) as a result, her total pay should have been $27,388.335 ($2,106.795 x 13); but (5) she was paid only $26,449.44, which is $938.895 short ($27,388.335 - $26,449.44).

Defendants move for summary judgment on Plaintiff's Wage Act claim arguing that Nashoba paid Plaintiff more than was required by law, and, thus, there is no basis for liability for unpaid wages.  Defendants explain that Plaintiff elected to be paid in 26 equal bi-weekly payments, rather than 22, and she was paid $3,757.50 every two weeks.[4]  When Nashoba terminated Plaintiff's employment after 13 weeks, she had received six biweekly paychecks totaling $22,545 ($3,757.50 x 6).  In order to determine if additional wages were owed, Nashoba engaged in the following calculations, which it performs each time a teacher is separated from employment mid-year: (1) it determines the "Daily Rate" by dividing the teacher's annual salary by the number of days the teacher was scheduled to work throughout the year; (2) it determines

---

[4] Neither party explains why Plaintiff was paid $3,757.50 every two weeks, as this rate of pay would amount to an annual salary of $97,695 ($3,757.50 x 26), which is $4,996 more than her undisputed annual salary of $92,699.

13

the number of "Compensable Days" by adding the number of days actually taught, plus the number of sick days taken, minus the number of sick days taken that had not yet accrued; and (3) it determines the total wages earned, or "Earned Wages Upon Separation," by multiplying the Daily Rate figure times the Compensable Days figure.  Thereafter, Nashoba pays the separated teacher the difference between their Earned Wages Upon Separation and the wages the teacher has been paid.  Applying this methodology to Plaintiff's employment resulted in the following calculations: (1) Plaintiff's Daily Rate was $503.80, representing her annual salary of $92,699 divided by the 184 days she was scheduled to work; (2) Plaintiff's Compensable Days figure was 52.5, which Defendants fail to break down but which the court understands based on the parties representations to consist of 47 days worked, plus 9 sick days and 1 personal day taken, minus 4.5 sick days taken but not yet accrued; and (3) Plaintiff's Earned Wages Upon Separation figure was $26,499.50 ($503.80 x 52.5).  Thereafter, Defendants paid Plaintiff $3,904.44, representing the difference between her Earned Wages Upon Separation of $26,499,50 and the $22,545 she had already been paid.

Defendants maintain that it would "unquestionably [have] been lawful" had Nashoba paid Plaintiff no more than the $22,545 it had already paid her in her first six equal bi-weekly paychecks before it discharged her at the 13-week mark, and, thus, Nashoba's payment to her of $3,904.44 more than that cannot be a violation of the Wage Act.  Defendants do not elaborate on why it would have been lawful to have paid Plaintiff compensation for only twelve workweeks when Plaintiff was not discharged until she had been in Defendants' employ for thirteen workweeks.  Defendants then go a step further and represent that it is "possible … Plaintiff would have received one more regular paycheck," i.e., her seventh equal by-weekly paycheck for 14 workweeks, bringing her total pay to $26,302.50, which Defendants note is still less than

the $26,499.50 she was paid under Nashoba's methodology.  According to Nashoba, this further reinforces the sufficiency of its payment of wages to Plaintiff under the Wage Act.

"[T]he purpose of the Massachusetts Wage Act is 'to protect employees and their right to wages,'" and the protections it offers are robust.  *Mui v. Mass. Port Auth.*, 89 N.E.3d 460, 462 (Mass. 2018) (quoting *Elec. Data Sys. Corp. v. Attorney Gen.*, 907 N.E.2d 635, (Mass. 2009)). The Wage Act provides strict liability for employer violations and treble damages in the civil context, as well as potential criminal liability.  Mass Gen. Laws ch. 149, §§ 27C, 148, 150. Employers are required to pay each employee "weekly or bi-weekly … the wages earned by h[er] to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week," and to pay any employee "discharged from …. employment … in full on the day of h[er] discharge."  Mass. Gen. Laws ch. 149, § 148. "'While the [Wage] Act makes clear on its face holiday pay, vacation pay, and definitely determined commissions fall within its protections, the term "wages" is not otherwise defined.'" *Furtado v. Republic Parking Sys., LLC*, No. 19-cv-11481-DJC, 2020 WL 996849, at *3 (D. Mass. Mar. 2, 2020) (quoting *Weiss v. DHL Express, Inc.*, 718 F.3d 39, 47 (1st Cir. 2013)). Massachusetts courts have not adopted a broad definition of "wages," instead looking to the purpose of the Act – to prevent the unreasonable detention of wages - to construe "wages" as "amounts 'definitively determined and ... due and payable to the employee.'"  *Sullivan v. etectRx, Inc.*, 67 F.4th 487, 496 (1st Cir. 2023) (quoting *Mui*, 89 N.E.3d at 462-63).  "'[B]ecause the Wage Act carries criminal penalties … courts have been reluctant to extend its reach beyond the wages, salary, holiday pay, vacation pay, and definitely determined commissions which the statute expressly mentions.'"  *Furtado*, 2020 WL 996849, at *3 (quoting *Roma v. Raito, Inc.*, No. 1:13-CV-10297-LTS, 2015 WL 1523098, at *7 (D. Mass. Mar. 31, 2015)).

Section 148 does not address sick pay, which is instead covered separately in § 148C. Section 148C establishes a minimum rate at which sick time must accrue (one hour for every 30 hours worked) and which employers are not required to let employees use until the employee has been employed for 90 calendar days and even then, only as it accrues and only if the employee or a family member is ill.  Mass. Gen. Laws ch. 149, § 148C.  The provisions of § 148C do not prohibit employers from allowing the accrual of earned sick time at a faster rate, or the use of earned sick time at an earlier date than the section requires.  *Id.*  Finally, employers are not required to compensate employees for unused sick time.  *See* Mass. Gen. Laws ch. 149, § 148C(d)(7).  The question of whether sick time is "wages" is not a novel one.  The Supreme Judicial Court declined the invitation to broaden the scope of the term "wages" under the Wage Act to encompass "sick pay."  *Mui*, 89 N.E.3d at 463.   In reaching its decision, the court reasoned that because an employee may use accrued sick time under appropriate conditions, i.e., illness, but may "lose" it if not used, unused accrued sick time cannot be a wage, even where the employer had a policy allowing employees to collect unused sick time upon their departure.  *Id.*

Given the language of the statute and the SJC's interpretation of it, Nashoba is entitled to summary judgment in its favor on Plaintiff's claim.  Plaintiff is correct that the SJC has held that the Wage Act, which prohibits employers from exempting themselves from its provision by "special contract," Mass. Gen. Laws ch. 149, § 148, "generally prohibit[s] an employer from deducting, or withholding payment of, *any* earned wages."  *Camara v. Attorney General*, 941 N.E.2d 1118, 1121 (Mass. 2011).  Plaintiff is also correct that under Nashoba's methodology, Nashoba deducted the value of 4.5 used unaccrued sick days.  However, given the SJC's unequivocal holding that unused accrued sick pay is not "wages," it follows that unaccrued sick pay cannot be wages.  The fact that Nashoba allowed Plaintiff to use portions of her sick day

16

allowance before she had accrued the equivalent value in sick pay, as the statute allows, does not transform the unaccrued sick pay into wages. Thus, Nashoba did not deduct, or withhold payment of any earned wages when it deducted the value of 4.5 unaccrued sick days in the calculation of Plaintiff's wages. Nor is Plaintiff's argument that Nashoba's methodology somehow improperly converted her into a per diem employee tenable. Nashoba's methodology, which it applies to all teachers who separate mid-year, avoids the problem of teachers who elect to be paid on a nine-month schedule and are dismissed mid-year getting paid more than teachers with an identical salary who elect to be paid on a twelve-month schedule. Not only is such a practice logical, but also such a calculation may be required by the statute, which provides that "[c]ompensation paid to public … schoolteachers shall be deemed to be fully earned at the end of the school year, and proportionally earned during the school year." Mass. Gen. Laws ch. 149, § 148.

Moreover, Plaintiff's calculation that she was owed at least $27,388.335 in wages is premised upon the notion that she could have elected to be paid in 22 equal bi-weekly payments rather than 26 bi-weekly payments. She does not point to any authority that would give her the right to change her election halfway through the year. In any event, while this likely would be a lawful way to calculate Plaintiff's wages, which were "proportionately earned during the school year," rather than over the calendar year, Nashoba would still be entitled to reduce the figure by the value of the 4.5 unaccrued used sick days, which, again, were not "earned wages." Using Defendants' daily rate, this would result in a figure of $25,121.235 ($27,388.335 – ($503.80 x 4.5)), which is less than the $26,499.50 that Nashoba paid Plaintiff. Thus, Plaintiff presents no factual or legal basis for imposing strict liability and treble damages on Nashoba for nonpayment of wages under the Wage Act.

C. Counts III and IV: Wrongful Termination and Failure to Accommodate in Violation
   of Federal Law Against Nashoba and in Violation of State Law Against Nashoba,
   Friend, and Clenchy

In Counts III and IV of her amended complaint, Plaintiff claims that Nashoba, in

violation of federal and state law, and Nashoba, Friend, and Clenchy, in violation of state law,

discriminated against her by terminating her employment because of and by failing to reasonably

accommodate her disabilities, namely kidney stones and a prolapsed bladder.  Defendants move

for summary judgment on the ground that Plaintiff has not established that she is disabled within

the meaning of the ADA or ch. 151B due to kidney stones or a prolapsed bladder.  Plaintiff

disagrees.

"The statutory definitions of 'disability' under the ADA and 'handicap' under chapter

151B are 'essentially the same.'" *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 87 n.5 (1st Cir.

2012) (quoting *Faiola v. APCO Graphics, Inc.*, 629 F.3d 43, 47 n.2 (1st Cir. 2010)).  The two

statutes, therefore, can be considered together." *Sutherland v. Peterson Oil Serv., Inc.*, Civil

Action No. 21-10902-MRG, 2024 WL 1924251, at *3 (D. Mass. Mar. 31, 2024).  "In order to be

considered disabled under the definition of the ADA, a person must '(1) have a physical or

mental impairment that substantially limits one or more life activity; (2) have a record of having

such impairment; or (3) be "regarded as" having such an impairment.'" *Sutherland*, 2024 WL

1924251, at *4 (citing 42 U.S.C. § 12102(2)); *Cosme-Perez v. Municipality of Juana Diaz*, 110

F. Supp. 3d 357, 365 (D.P.R. 2015)).  "Courts apply a three-prong test to determine disability,

considering (1) whether plaintiff has a physical or mental impairment; (2) whether the life

activities plaintiff relies upon are 'major' or 'of central importance to daily life'; and (3) whether

the impairment substantially limits plaintiff's major life activities." *Together Emps. v. Mass*

*Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 429 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022)

(quoting *Carroll v. Xerox Corp.*, 294 F.3d 231, 238 (1st Cir. 2002)).  Evidence of a medical diagnosis by itself is insufficient.  It is well-established that there must also be evidence of substantial impairment to at least one major life activity.  *Id.*  (citing *Ramos-Echevarría v. Pichis, Inc.*, 659 F.3d 182, 187 (1st Cir. 2011)).

In urging summary dismissal of Plaintiff's disability discrimination claims, Defendants address each of Plaintiff's impairments separately.  Regarding Plaintiff's kidney stones, Defendants note that Plaintiff had at most four absences due to kidney stones and made only one visit to the hospital for kidney stones while in Nashoba's employ.  They characterize Plaintiff's kidney stones as a temporary illness and cite to cases in which courts have found kidney stones not to be disabling in circumstances where the plaintiffs' conditions were far more severe than Plaintiff's.  *See Pérez-Maspons v. Stewart Title P.R., Inc.*, 208 F. Supp. 3d 401, 422 (D.P.R. 2016) (granting summary judgment to the defendants on the plaintiff's ADA discrimination claim where he had a kidney stone which required a 9-day hospitalization followed by a 3-week recovery but suffered no limitations thereafter because it was a "brief and temporary medical condition with discrete beginning and end points" that did not substantially limit the plaintiff's major life activities); *Mastrio v. Eurest Servs., Inc.*, Civil Action No. 3:13-cv-00564 (VLB), 2014 WL 840229, at *6 (D. Conn. Mar. 4, 2014) (dismissing the plaintiff's ADA discrimination claim based on insufficient allegations of a disability where he alleged that he missed one month of work while undergoing treatment for kidney stones but alleged no continuing impairments thereafter); *Clay v. Campbell Cnty. Sheriff's Office*, No. 6-12-cv-00062, 2013 WL 3245153, at *3 (W.D. Va. June 26, 2013) (same where the plaintiff alleged that he suffered a temporary, one-time issue with kidney stones that resolved within two weeks).

Regarding Plaintiff's prolapsed bladder, Defendants point out that, despite the fact that Plaintiff became aware of the condition in 2019, she had no absences from work due to it while in Nashoba's employ, that her sole treatment was a pessary, and that, while Plaintiff alleged symptoms of frequent urination, discomfort, pain, and increased urinary tract and yeast infections, "she was unable, or unwilling" to provide details about how those symptoms limited her activities.  Defendants contrast the lack of evidence in the record of limitations from Plaintiff's prolapsed bladder condition with two cases in which courts found that the plaintiffs were disabled within the meaning of the ADA due to the same condition where the factual records supported findings of severe limitations.  *See Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 961 (7th Cir. 2014) (reversing grant of summary judgment in favor of the defendant where the plaintiff's disability due to her prolapsed bladder, which had required a hysterectomy and bladder reconstruction, was not contested because of the resulting limits in her ability to lift and push and in her vaginal and bladder functions); *Zemrock v. Yankee Candle*, Case No. 14-cv-30107-KAR, 2017 WL 506249, at *11 (D. Mass. Feb. 7, 2017) (finding the plaintiff disabled because her hysterectomy, which resulted in a bladder prolapse, substantially limited the major life activity of reproduction).

Plaintiff disputes the characterization of her kidney stones as a temporary illness. According to Plaintiff, the cases cited by Defendants are distinguishable because those plaintiffs did not show or allege that they suffered any limitations due to their kidney stones, while Plaintiff has shown that she has chronic kidney stones[5] that lead to repeated acute episodes

---

[5] Plaintiff points to her production of medical records from 2015, 2016, 2017, 2020, and 2023 documenting the existence of kidney stones.

causing extreme pain, with no end point in sight.[6]  Plaintiff points to her deposition testimony that the two conditions together require her to drink more fluids and urinate more frequently, make it uncomfortable for her urinate and to sit or stand for prolonged periods, and can lead to discomfort necessitating her absence from work.  According to Plaintiff, this is sufficient to create a triable issue as to whether she is disabled in light of the provisions of the ADA including bladder function as a "major life activity," 42 U.S.C. § 12102(2)(B), and providing that an impairment that is episodic is a disability if it would substantially limit a major life activity when active.  42 U.S.C. § 12102(4)(D).

There is no factual dispute that Plaintiff suffers from the physical impairments of chronic kidney stones and a prolapsed bladder, and there can be no legal dispute that bladder function – the only activity Plaintiff identifies – is a major life activity.  Thus, the sole question is whether there is a triable issue as to whether Plaintiff's kidney stones or prolapsed bladder substantially limit Plaintiff's bladder function.  To satisfy this standard, a plaintiff must "offer[ ] evidence that the extent of the limitation in terms of her own experience … is substantial."  *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999); *Ramos-Echevarría v. Pichis, Inc.*, 659 F.3d 182, 188 (1st Cir. 2011).  Per the EEOC, the term "substantially limits" is to be "construed broadly in favor of expansive coverage," and is not "meant to be a demanding standard."  29 C.F.F. § 1630.2 (j)(1)(i).  The regulations go on to provide that:

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

---

[6] Plaintiff testified at her deposition that "she is always going to have kidney stones" and that when they "decide to move," they can get "lodged somewhere" leading to an "acute episode."

> Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii).  Plaintiff's claim is that she is substantially limited in bladder function because, due to her kidney stones and prolapsed bladder, she must urinate more frequently and that the act of doing so is painful.[7]  Plaintiff has not shown that her need for frequent voiding or the discomfort that doing so entails substantially limits her bladder function.  While Plaintiff need not present evidence that her kidney stones and prolapsed bladder completely prevent or severely restrict her bladder function, she must demonstrate that they substantially limit her bladder function as compared to the general population.  Her vague references to the need to urinate more frequently and to the experience of discomfort or pain when voiding do not meet the threshold of showing that her own experience of limitation in bladder function is substantial.  This is not to say that the need for frequent urination or painful voiding could never constitute a substantial limitation on bladder function, but the record here simply does not rise to that level.  Substantially limiting may not be an exacting standard, but it is not a non-existent standard.  Thus, while the court agrees with Plaintiff that the chronic kidney stone condition from which she suffers differs from that experienced by the plaintiffs in the cases cited by Defendants, Plaintiff has nevertheless failed to create a triable issue of fact as to whether she is disabled within the meaning of the ADA or chapter 151B.  Thus, Defendants are entitled to summary judgment on Counts III and IV of Plaintiff's amended complaint.

---

[7] Plaintiff has not put any evidence in the record that the alleged limitations in her ability to sit or stand, which are unquantified in any event, have any limiting effect on her bladder function.

D.  Count VIII: Violation of the Massachusetts Civil Rights Act Against Nashoba and Friend

In Count VIII of her amended complaint, Plaintiff brings a claim under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, 11I.  Section 11I creates a private right of action for any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the Commonwealth, has been interfered with by threats, intimidation, or coercion by another person, whether or not acting under color of law.  *See* Mass. Gen. Laws ch. 12, §§ 11H, I.  "To establish a claim under the [MCRA], 'a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion.'"  *Barron v. Kolenda*, 203 N.E.3d 1125, 1139-1140 (Mass. 2023) (quoting *Glovsky v. Roche Bros. Supermkts., Inc.*, 17 N.E.3d 1026, 1035 (Mass. 2014)).  Plaintiff has explained that the claim is premised on the allegations that, Friend asked Plaintiff, who is Jewish, if she really needed to take a religious holiday off work and that doing so could affect her employment after Plaintiff requested to take a personal day on September 28, 2020, for Yom Kippur.  Thereafter, Plaintiff withdrew her request for the personal day.

Defendants move for summary judgment arguing that Nashoba is not a person within the meaning of the MCRA, and, therefore, cannot be sued for violating the statute.  Plaintiff does not contest this representation, and Defendants are correct as a matter of law.  *See Meagher v. Andover Sch. Comm.*, 94 F. Supp. 3d 21, 45 (D. Mass. 2015) ("There is no dispute that [the Andover School Committee and the Andover School Department] are municipal entities, and 'under Massachusetts law a municipality cannot be sued under the MCRA.'" (quoting *Kelley v.*

23

*LaForce*, 288 F.3d 1, 11 n.9 (1st Cir. 2002))).  Accordingly, Nashoba is entitled to summary judgment with respect to Plaintiff's MCRA claim.

As to Friend, Defendants argue that Plaintiff has a pending religious discrimination claim under Mass. Gen. Laws ch. 151B, rendering her MCRA claim duplicative and subject to dismissal.  Plaintiff replies that her MCRA claim differs from her 151B claim in that her MCRA claim does not allege that Friend took an adverse employment action against her, but rather that she coerced Plaintiff into working on Yom Kippur in violation of a religious prohibition on doing so, thereby interfering with her right to freedom of religion as guaranteed by Article II of the Massachusetts Declaration of Rights.

Chapter 151B makes it unlawful for an employer to "impose upon an individual as a condition of … retaining employment any terms or conditions, compliance with which would require such individual to violate, or forego the practice of," sincerely held religious beliefs, and it requires the employer to make "such accommodation" to the religious practice "as shall not cause undue hardship in the conduct of the employer's business."  Mass. Gen. Laws ch. 151B, § 4(1A).  In making a claim of religious discrimination, a plaintiff must meet the initial burden of establishing a prima facie case that the employer required the plaintiff to violate a required religious practice.  *Brown v. F.L. Roberts & Co.*, 896 N.E.2d 1279, 1283 (Mass. 2008).  The plaintiff also must "demonstrate that he or she gave the employer the required notice of the religious obligations."  *Id.* (quoting *New York & Mass. Motor Serv., Inc. v. Massachusetts Comm'n Against Discrimination*, 517 N.E.2d 1270, 1276 (Mass. 1988)).  If the plaintiff meets her burden, "the burden then shifts to the employer 'to prove that accommodation of the [plaintiff's] religious obligations would impose ... an undue hardship' pursuant to the statute."  *Id.* (quoting *New York & Mass. Motor Serv.*, 517 N.E.2d at 1276).

24

Accordingly, construing a ch. 151B religious discrimination claim to require an adverse employment action as an element is incorrect.  Nor has Plaintiff identified any alleged adverse employment action (apart from the failure to accommodate her right to engage in an important religious observance, which is the act that constitutes the alleged discrimination on the basis of religion).  Plaintiff maintains that she was fired for taking too many sick days, not for requesting a personal day on Yom Kippur.  Thus, Plaintiff's claim under ch. 151B and her claim under the MCRA are the same, and ch. 151B § 9 is the exclusive remedy for a violation of § 4, including for religious discrimination in employment.  Because "[c]omplaints constituting [ch.] 151B claims cannot be refashioned into MCRA claims," *Butner v. Dept. of State Police*, 803 N.E.2d 722, 727-28 (Mass. App. Ct. 2004) (citing *Green v. Wyman-Gordon Co.*, 664 N.E.2d 808, 811 (Mass. 1996); *Mouradian v. General Elec. Co.*, 503 N.E.2d 1318, 1321 (Mass. App. Ct. 1987); *see also Dexter v. Dealogic, LLC*, 390 F. Supp. 233, 244 (D. Mass. 2019) (ch. 151B provides the exclusive remedy for employment discrimination that is not based on preexisting tort law or a constitutional protection).  Friend, too, is entitled to summary judgment on Plaintiff's MCRA claim.[8]

E. <u>All Counts Against Clenchy (Counts II, III, IV, and VII)</u>

Plaintiff names Clenchy as a defendant in Counts II, III, IV, and VII of her amended complaint for violation of the Wage Act, disability discrimination, failure to accommodate, and retaliation, respectively.  Defendants have moved for summary judgment on these claims as to Clenchy.  Because the court has already determined that Defendants are entitled to summary judgment on Counts II, III, and IV, the only claim remaining to be addressed is Plaintiff's claim

---

[8] Plaintiff's citation to *KrupienDep v. Ritcey*, 112 N.E.3d 302 (Mass. App. Ct. 2018), is not instructive, as the sole issue before the court was whether the defendants were entitled to qualified immunity on the plaintiff's MCRA claim.  *Id*. at 304.

in Count VII for retaliation.  Retaliation is an independent cause of action under both the ADA

and chapter 151B.  *Wright v. CompUSA, Inc.*, 352 F.3d 472, 477 (1st Cir. 2003) (noting that a

plaintiff need not succeed on a discrimination claim to bring a retaliation claim); *see also* 42

U.S.C. § 12203(a); Mass. Gen. Laws ch. 151B, §4.  The standard under both statutes is the same.

*D.B. ex. rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012).

     To make out a prima facie case of retaliation, a plaintiff must demonstrate that she (1)

engaged in protected conduct, (2) was subjected to an adverse action by the defendant, and (3)

there was a causal connection between the protected conduct and the adverse action.  *Id.*  If the

plaintiff establishes her prima facie case, the burden shifts to the defendant to articulate a

legitimate, non-discriminatory explanation for the adverse action.  *Id.*  Finally, if the defendant

meets this burden, the burden shifts back to the plaintiff to show that the proffered legitimate

explanation is a pretext and that the defendant was actually motivated by a retaliatory animus.

*Id.*  Defendants move for summary judgment on Plaintiff's retaliation claim only as to Clenchy.

According to Defendants, Plaintiff has not put forth any evidence from which a factfinder could

conclude that Clenchy knew that Plaintiff engaged in  protected activity or that Clenchy took any

action that could be considered retaliatory.  Plaintiff responds that Clenchy signed her dismissal

letter and, by law, had to review and approve Plaintiff's dismissal.  *See* Mass. Gen. Laws ch. 71,

§ 42 ("A principal may dismiss or demote any teacher or other person assigned full-time to the

school, subject to the review and approval of the superintendent.").

     Here, the court agrees with Plaintiff.  In support of summary judgment, Defendants argue

that "Clency … had no active involvement in Plaintiff's employment whatsoever" (Dkt. No. 47

at 15).  However, in support, Defendants cite to Clenchy's affidavit, which only avers that she

had "no active role in the decision to hire [Plaintiff]," and that, to the extent she was involved," it

was a *pro forma* approval of the hiring decision recommended by others (Dkt. No. 48-13 at ¶ 4-5).  The affidavit is silent about Clenchy's role in the termination of Plaintiff's employment.  As to the issue of Clenchy's knowledge of Plaintiff's protected activity, Clenchy represents in the affidavit that, to the best of her knowledge, she never knew about Plaintiff's prior employment with, or her MCAD charge against, the Assabet Valley Collaborative.  As an initial matter, a jury could choose not to credit Clenchy on this point given that she sat on the Board of Directors for the Collaborative.  Moreover, Clenchy does not aver that she was unaware of Plaintiff's protected activity – identified in Plaintiff' amended complaint as a request for reasonable accommodation – at Nashoba.  Given that Clenchy signed Plaintiff's termination letter, a reasonable finder of fact could conclude that Clenchy knew that Plaintiff engaged in protected activity shortly before the termination of her employment and that Clenchy was involved in terminating her employment.  *See Ciccarelli v. School Dept. of Lowell*, 877 N.E.2d 609, 615 (Mass. App. Ct. 2007) (finding sufficient evidence to support a jury verdict of an adverse employment action by the deputy superintendent based the assignment of ultimate responsibility for firing to superintendents in Mass. Gen. Laws ch. 71, § 42).  Thus, Clenchy is not entitled to summary judgment in her favor on Plaintiff's retaliation claim.

## IV.    CONCLUSION

For the above-stated reasons, Defendants' motion for partial summary judgment (Dkt. No. 46) is GRANTED in part and DENIED in part.  Summary judgment shall enter in favor of Defendants on counts I (breach of contract), II (Massachusetts Wage Act), III (disability discrimination), IV (failure to accommodate), and VIII (violation of the Massachusetts Civil Rights Act.

It is so ordered.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED: August 28, 2024